LAW OFFICE OF DAVID A. SNYDER
2 White Horse Pike
Haddon Heights, NJ  08035
856-547-5888
Fax 856-547-5885
e-mail: dasnyderlaw@aol.com
Attorney for the Birth Mother, L.B.

| | |
|---|---|
| STATE OF NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES | SUPERIOR COURT OF NEW JERSEY APPELLATE DIVISION |
| Plaintiff - Respondent | DOCKET NO. A-4437-11T3 |
| V. | SUPERIOR COURT OF NEW JERSEY |
| L. B. | CHANCERY DIVISION FAMILY PART |
| Defendant - Appellant | SALEM COUNTY |
| | DOCKET  NO. SAL-FN-17-39-11 |
| In the Matter of L.J.B., a minor | Civil Action |

Appeal from a Final Order
Finding Abuse and Neglect and
a Final Disposition Order
Awarding Custody of Minor
Child to Birth Father From
the Superior Court, Chancery
Division, Cumberland County.

Sat Below:  The Honorable
Darrell M. Fineman, J.S.C.,
without a jury on fact
finding.

Sat Below: The Honorable Gary
D. Wodlinger, J.S.C., without
a jury on disposition,
hearing.

**INITIAL BRIFF OF THE APPELLANT, L.B.**

TABLE OF CONTENTS

Page No.

Procedural History                                          1

Statement of Facts                                          5

Legal Argument


POINT ONE

THE TRIAL COURT COMMITTED ERROR BY FINDING THE
APPELLANT ABUSED OR NEGLECTED HER CHILD AND THE LOWER
COURT'S DECISION SHOULD BE REVERSED.

                                                           15


POINT TWO

THE CASE SHOULD HAVE BEEN DISMISSED AND THE CHILD
SHOULD HAVE BEEN RETURNED TO THE MOTHER'S CARE BECAUSE
THE DYFS FAILED TO PROVE BY A PREPONDERANCE OF THE
EVIDENCE THAT THE CHILD WAS ABUSED OR NEGLECTED BY
L.B.

                                                           23


POINT THREE

THE COURT COMMITTED ERROR BY AWARDING PHYSICAL AND
LEGAL CUSTODY TO THE FATHER, L.J.

                                                           25


a. Appellant's due process rights were violated by the
   court proceeding to a G.M. hearing without
   relieving the dyfs from its obligation to provide
   reasonable efforts to re-unify the family and by
   not conducting a permanency hearing.

                                                           25

b. Neither the DYFS nor the father established it was
   in the best interest of the child to award custody
   to the father.

                                                           34

Conclusion                                                 43

:

DEFENDANT'S APPENDIX VOLUME ONE

Complaint                                                Da1

September 23, 2010 Order                                 Da62

October 13, 2010 Order                                  Da66

November 10, 2010 Order                                 Da70

January 9, 2011 Order                                   Da74

February 8, 2011 Order                                  Da78

February 23, 2011                                       Da79

April 15, 2011 Order Finding Abuse and Neglect          Da83

April 15, 2011 Case Management Order                    Da85

May 18, 2011 Order                                      Da89

June 14, 2011 Order                                     Da93

DEFENDANT'S APPENDIX VOLUME TWO

Screening summary dated, September 20, 2010             Da95

Investigation summary, dated September 20, 2010         Da110

Certified Court records from Brookhaven Court           Da120

Delaware County Court of Pleas Certificate of
Imposition of Sentence, dated February 10, 2011         Da132

Psychological report by Dr. Roger T. Barr of Appellant
and L.J, dated November 12, 2010                        Da134

Psychological evaluation by Dr. Barr of MGM, dated
December 13, 2010                                       Da141

Updated evaluation by Dr. Barr of the Appellant, dated
January 16, 2011                                        Da144

Updated report by Dr. Barr of Appellant, dated
February 1, 2011                                        Da149

Psychiatric reports of the Appellant from Psychiatric
and Addiction Services of Southern New Jersey, dated
November 16, 2010, April 7, 2011, and April 21, 2011          Da151

Child Family Resource Center reports, dated
March 21, 2011 and April 28, 2011,                           Da163

March 28, 2012 Order Terminating litigation under
Docket No. SAL-FN-17-39-11                                   Da169

March 28, 2012 Compliance Review Order Awarding Custody
of Minor Child to Birth Father under Docket No.
SAL-FD-17-157-09                                             Da171

March 28, 2012 Order with Written Decision                   Da174

Notice of Appeal                                             Da179

TABLE OF CASES

Page Nos.

Beck v. Beck, 86 N.J. 480 (1981)                                 34

Hand v. Hand, 391 N.J. Super. 102 (App. Div. 2007)              34

In re Guardianship of C.R., 364 N.J. Super. 263
(App. Div. 2003)                                                32

In re Guardianship of D.M.H., 161 N.J. 365 (1999)              20

In re Gaurdianship of J.T., 269 N.J. Super. 172
(App. Div. 1993)                                                18

N.J. Div. of Youth and Family Servs. v. G.L.,
191 N.J. 596 (2007)                                             18,19

N.J. Div. of Youth and Family Servcs. v. G.M.,
398 N.J. Super. 21 (App. Div. 2008) aff'd in part,
modified in part 198 N.J. 382 (2009)                            7,23,25,
                                                                26,31,33,
                                                                34

N.J. Div. of Youth and Family Servs. v. I.H.C.,
415 N.J. Super. 551 (App. Div. 2010)                           19,22

N.J. Div. of Youth and Family Servs. v. J.Y.,
352 N.J.Super. 245 (App. Div. 2002)                            18

N.J. Div. of Youth and Family Servs. v. M.M.,
189 N.J. 261 (2007)                                             18

N.J. Div. of Youth and Family Servcs. v. M.Y.J.P.,
360 N.J. Super. 426 (App. Div.), cert. denied
177 N.J. 575 (2003), cert. denied 540 U.S. 1162,
124 S.Ct. 1176, 157 L.Ed. 2d 1207 (2004)                       32

N.J. Div. of Youth and Family Servcs. v. N.D
(In re T.W.) 417 N.J. Super. 96 (App. Div. 2010)               23

N.J. Div. of Youth and Family Servcs. v. S.A.,
383 N.J. Super. 525 (App. Div. 2006)                           31

N.J. Div. of Youth and Family Servs. v. S.S.,
372 N.J. Super. 13 (App. Div. 2004), cert. denied,
182 N.J. 426 (2004)                                             17,20,22

## STATUTES

| | |
|---|---|
| N.J.S.A.  9:2-4(c) | 40 |
| N.J.S.A.  9:6-8.21(c)(4) | 17 |
| N.J.S.A.  9:6-8.21(c)(4)(b) | 19 |
| N.J.S.A.  9:6-8.44 | 19 |
| N.J.S.A.  9:6-8.46(b) | 20 |
| N.J.S.A.  9:6-8.46(c) | 26 |
| N.J.S.A  9:6-8.50 | 32 |
| N.J.S.A.  9:6-8.50(c) | 23 |
| N.J.S.A.  9:6-8.50(d) | 18 |
| N.J.S.A.  9:6-8.51 | 23 |
| N.J.S.A.  9:6-8.51(a) | 26 |
| N.J.S.A.  9:6-8.51(b) | 26 |
| N.J.S.A.  9:6-8.52 | 26 |
| N.J.S.A.  9:6-8.53 | 26 |
| N.J.S.A.  9:6-8.54(a) | 26 |
| N.J.S.A.  9:6-8.55 | 26 |
| N.J.S.A.  9:6-8.56 | 26 |
| N.J.S.A.  30:4C-11.1(b) | 26 |
| N.J.S.A.  30:4C-11.2 | 30 |
| N.J.S.A.  30:4C-11.3 | 30,31 |
| N.J.S.A.  30:4C-61.2 | 25,31,32 |

## PROCEDURAL HISTORY

On September 23, 2010, the State of New Jersey, Division of Youth and Family Services ("DYFS"), filed a Verified Complaint for Custody, Docket No. SAL-FN-17-39-11, in the Superior Court of New Jersey, Chancery Division, Family Part, Salem County, against the parents of the minor child, L.J.B, the mother, Lateefah Brown ("L.B."), the appellant in the matter, and the father, Lamarr Johnson ("L.J."), seeking an Order for Custody, Care, and Supervision of L.J.B. (Da1 – 61)[1].  A hearing on the complaint for the emergency removal was heard by the Honorable Darrell M. Fineman, J.S.C., on September 23, 2010, and the court entered an Order to Show Cause appointing a Law Guardian for the minor child, and awarding temporary custody of the minor child to the DYFS. (Da62 – 65).

On October 13, 2010, the Return on the Order to Show Cause was held before Judge Fineman and the court continued the care and supervision of the minor child with DYFS but granted physical and legal custody of the minor child to the father, L.J., under SAL-FN-17-39-11.  In addition, the court ordered that the Appellant, L.B., receive parenting time of two times per week for two hours supervised by the DYFS or a DYFS approved supervisor. (Da66 – 69).

---

[1] "Da" – refers to the Defendant, L.B., appendix.

1

A case management hearing was conducted before Judge Fineman on November 10, 2010, at which time the court continued care and supervision of the minor child with DYFS with legal and physical custody of the minor child with L.J., and with parenting time by the Appellant to remain the same. (Da70 - 73). On January 19, 2011, a case management conference was held before Judge Fineman at which time the court continued care and supervision of the minor child with DYFS with legal and physical custody of the minor child with L.J., and with parenting time by the Appellant to remain the same. (Da74 - 77). On February 8, 2011, Judge Fineman entered an Order terminating the services of CASA on behalf of the minor child in the case. (Da78). On February 23, 2011 a case management conference was held before Judge Fineman at which time the court continued care and supervision of the minor child with DYFS with legal and physical custody of the minor child with L.J., and with parenting time by the Appellant to remain the same. As part of the court order, the Appellant was ordered to attend counseling at the Child and Family Resource Center and have medication monitoring with Dr. Baruch and comply with all recommendations. The trial date for the fact finding was set for April 15, 2011. (Da79 - 82).

The fact finding was heard before Judge Fineman on April 15, 2011. After review of exhibits from DYFS and testimony from the Appellant, Judge Fineman found by a preponderance of the

2

evidence that the Appellant had abused and neglected the minor child in that she had uncontrolled aggression toward L.J. which resulted in the Appellant assaulting L.J. while the minor child was nearby during a court ordered custody exchange. (Da83 - 84; 1T 65-4 to 25)[2]. A case management review hearing followed the court's ruling. Judge Fineman ordered that care and supervision remain with the DYFS, legal and physical custody of the minor child remain with L.J., the Appellant to continue receiving parenting time twice per week for two hours, and the Appellant to continue to comply with counseling and medication monitoring as previously ordered. (Da85 - 88).

A compliance review hearing was held on May 18, 2011, before the Honorable Gary D. Wodlinger, J.S.C. Judge Wodlinger ordered that care and supervision remain with DYFS, legal and physical custody of the minor child continue with L.J., the Appellant to continue receiving parenting time twice per week for two hours, and the Appellant to continue to comply with counseling and medication monitoring previously ordered by Judge Fineman. Since the parties disputed custody of the minor child a disposition hearing on custody was set for September 26, 2011. (Da89 - 92). On June 14, 2011, Judge Wodlinger entered an Order appointing CASA on behalf of the minor child. (Da93 - 94). On

---

[2] "1T" - refers to the fact finding trial transcript dated April 15, 2011.

3

September 26, 2011, the disposition hearing regarding custody of
the minor child was adjourned to December 14, 2011. The fact
finding trial was conducted on December 14, 2011, January 30,
2012, and March 28, 2012, before Judge Wodlinger. (2T 1-1 to 70-
5; 3T 1-1 to 87-12; 4T 1-1 to 35-3)[3].

     On March 28, 2012, Judge Wodlinger entered an Order
terminating the litigation in Docket No. SAL-FN-17-39-11 and
entered an Order granting legal and physical custody of the
minor child, L.J.B., to L.J., under Docket No. SAL-FD-17-157-09.
(Da169 – 178). A timely Notice of Appeal was filed on May 8,
2012. (Da179 – 180).

---

[3] "2T" – refers to the trial transcript dated December 14, 2011.
  "3T" – refers to the trial transcript dated January 30, 2012.
  "4T" – refers to the trial transcript dated March 28, 2012.

## STATEMENT OF FACTS

At the fact finding trial on April 15, 2011, the DYFS moved into evidence without objection four exhibits; P-1, Screening summary dated, September 20, 2010, (Da95 – 109), P-2, Investigation summary, dated September 20, 2010, (Da110 – 119), P-3, Certified Court records from Brookhaven Court, (Da120 – 131), and P-4, Delaware County Court of Pleas Certificate of Imposition of Sentence, dated February 10, 2011. (Da132 – 133)(1T 4-5 to 21). The DYFS called no witnesses in its case in chief. (1T 5-15 to 16).

The Appellant testified on her behalf. She stated that she was at the McDonald's parking lot in Brookhaven at around 9:00 am on September 18, 2010 along with her child, L.J.B, her mother, Lamona Booker (maternal grandmother "MGM"), her father, Dean Booker (step maternal grandfather "MGF"), for the purpose of exchanging the child with L.J. Also present was L.J., Leah Johnson (paternal grandmother "PGM"), Edward Johnson (paternal grandfather "PGF"), and Dwayne. (1T 9-13 to 10-14).

The exchange of the child started by L.B. asking L.J. if the parenting time could be done in the McDonald's so the baby could warm up to L.J. and L.J. responded by stating, "Oh, Lateefah, you know I can't do that." (1T 13-11 to 15). L.B. then put the child back in her car because she did not trust L.J. MGM was holding the minor child when L.B. put the child

5

back into her car. (1T 14-7 to 15).  She wanted parenting time
to be at the McDonald's over breakfast because the child had not
seen L.J. for a couple of months and she wanted the child to
warm up to L.J. but he refused. (1T 16-20 to 25).

The MGM then got out the car holding the minor child, who
was only 12 months old at the time, and L.B. then hit L.J.  At
the time she hit L.J. the minor child was with the MGM and PGM
in the car. (1T 18-10 to 20-1).  At the time she hit L.J., the
child was in the car and she and L.J. were standing behind the
car. (1T 20-11 to 21-1).  According to her testimony the MGM
took the child from L.B.'s car and took the child to the PGM who
was sitting in L.J.'s car.  MGM was doing this at the exact time
she hit L.J. (1T 21-16 to 22-6).  She was grabbed by the police
officers after she hit L.J. (1T 22-14 to 16).

After she was grabbed by the police she was put against the
hood of the police car and handcuffed.  The minor child was in
the car with the MGM and PGM when the police were arresting the
Appellant. (1T 23-16 to 24).

On re-direct, the Appellant stated that when she hit L.J.
the MGM was standing next to the front passenger side door while
the minor child was inside the car in the front passenger seat
with the PGM who was holding the child.  The Appellant and L.J.
were standing at the back of the car.  She testified that the
child could not have seen the incident because the child was

6

seated facing the front of the car and the incident occurred toward the rear of the car. She did not recall the child crying during the incident. (1T 41-2 to 42-11).

The custody hearing pursuant to N.J. Division of Youth and Family Servcs. v. G.M.[4] commenced on December 11, 2011, with the testimony of Dr. Joann Marie Schroder. (2T 5-7 to 8). The DYFS moved into evidence P1 through P-8, over the objection of Appellant's counsel: P-1, Form 9-7 Response Referral Report, dated September 20, 2010, (Da95 - 109); P-2, Delaware County Judgment of Sentence, (Da132 - 133); P-3, Psychological report by Dr. Roger T. Barr of Appellant and L.J, dated November 12, 2010, (Da134 - 140); P-4, Psychological evaluation by Dr. Barr of MGM, dated December 13, 2010, (Da141 - 143); P-5, Updated evaluation by Dr. Barr of the Appellant, dated January 16, 2011, (Da144 - 148), P-6; Updated report by Dr. Barr of Appellant, dated February 1, 2011, (Da149 - 150); P-7, Psychiatric reports of the Appellant from Psychiatric and Addiction Services of Southern New Jersey, dated November 16, 2010, April 7, 2011, and April 21, 2011, (Da151 - 162); and P-8, Child Family Resource Center reports, dated March 21, 2011 and April 28, 2011, (Da163 - 168). (2T 5-15 to 8-15). The DYFS also moved P-11, the

---

[4] 398 N.J. Super. 21 (App. Div. 2008) off's in part, modified in part 198 N.J. 382 (2009).

7

curriculum vitea of Dr. Schroder in as evidence without
objection. (2T 9-3 to 9).

Dr. Schroder was offered as an expert in psychology without
objection. (2T 9-10 - 16). Dr. Schroder testified she performed
a psychological and bonding evaluation between the Appellant and
the child and L.J. (2T 10-14 to 17). Dr. Schroder testified
L.J., was polite and cooperative with his evaluation but did
display some minimizations regarding past criminal history that
gave her some concerns. Specifically, L.J. admitted to being
arrested one time for urinating in public but did not disclose
that he was arrested for indecent exposure on two other
occasions. (2T 12-5 to 13-15). Dr. Schroder testified that the
conduct of exposing himself to adult women, consistent with an
exhibitionist disorder, was not likely to cause an impact upon
his son. She did not believe that this conduct would have a
direct impact upon raising the child although there was a
possible secondary impact that could affect parenting such as
marital discord, repeated offense which could result in
financial stress which could have a secondary impact upon the
child. (2T 13-16 to 14-6).

L.J.'s current living situation was sharing a home with the
PGM who was assisting with caring for the minor child; however,
he was engaged to a fiancé' that lived in Georgia and he was

8

planning to transfer to Georgia to work for the postal service.
(2T 14-9 to 17).

She gave the Personality Assessment Inventory to him, a
self administered test, that proved to be invalid due to him
overtly trying to hide his faults. (2T 14-25 to 15-19).  She
administered the Parenting Stress Inventory which again proved
to be invalid due to his inability to be forthright with the
test and his consistent minimization of his faults.  Both test
results concerned her since he was not forth coming with his
personal faults and potential faults regarding his care for his
son. (2T 16-2 to 13).  In regards to the bonding evaluation, Dr.
Schroder observed a secure attachment between L.J. and the
child.  The child appeared happy and comfortable with L.J.
although there was some possibility there was an insecure
attachment based upon the child at times backing away from L.J.
Her conclusion was he was a safe and stable parent. (2T 17-19 to
21-10).

In regards to the Appellant, Dr. Schroder reviewed several
records from past medical providers and examiners from DYFS.
Based upon review of the Appellant's records she was concerned
about the Appellant.  She testified that Dr. Baruch, a DYFS
provider, refused to treat the Appellant and recommended the
Appellant receive a higher level of care such as depo medication
or intensive partial hospitalization.  Dr. Baruch suspected the

9

Appellant was not taking her medication as prescribed and even allegedly called the pharmacy that the Appellant ordered her prescriptions from and allegedly learned she had not filled a prescription in over a year. Depo medication is a form of injecting medication on a monthly basis so the provider is assured the patient is taking their prescribed dosage. (2T 22-14 to 23-20).

Dr. Schroder testified that her own observations of the Appellant led to her to state that she was paranoid during the evaluation process. (2T 23-24 to 25-13). The Appellant told her that she had a Bipolar disorder and she had been diagnosed with a Schizophreniform Disorder. She told her that the reason DYFS was involved in her case is because she refused to admit she had a problem and only admitted to one crying episode. (2T 25-16 to 26-1). The Appellant's results on the Personality Assessment Inventory test were also invalid as she too minimized her faults. (2T 28-15 to 18). She administered the Child Abuse Potential Inventory to the Appellant and those results indicated the Appellant was minimizing problems. (2T 28-25 to 29-22).

The Appellant was well prepared for the bonding evaluation as she brought food, toys, a diaper bag, and games to the session. The bonding evaluation was compounded by the fact that it was the second scheduled evaluation and the child arrived about one late for the evaluation due to traffic, and the child

10

fell asleep on the ride to the examination, and had to be woken up before coming into the evaluation. When the child arrived he crawled away from the Appellant under a table. She was able to get him out from underneath the table but the child was upset and cried. The Appellant was vigilant about trying to sooth the child during the course of the evaluation and was successful on one occasion only to have the child become upset again requiring her to have to try and sooth the child a second time. (2T 30-5 to 32-16).

Dr. Schroder gave an opinion that the child was insecurely attached to the Appellant notwithstanding the fact that the child did have a relationship with her since he did desire to be picked up when she put him down but according to Dr. Schroder she was not able to sooth the child when she picked the child back up. Dr. Schroder testified that she did not believe that the Appellant could safely parent the child at the present time. (2T 32-17 to 33-13).

On cross-examination, Dr. Schroder testified that none of the records she reviewed indicated that the Appellant ever physically abused the minor child. Dr. Schroder testified that the child arriving late for the visit combined with falling asleep during the long car ride had a negative impact upon the evaluation due to no fault of the Appellant. (2T 44-25 to 46-20).

On January 30, 2012, the case worker, Michael Sterner, testified that the Appellant first became known to DYFS in May of 2010 when it was reported that the Appellant was arrested by the police after getting into an argument with her neighbor. The allegation was investigated and unfounded by the DYFS. (3T 13-1 to 13). The DYFS received another referral regarding the Appellant in September of 2010. The Appellant was arrested after she got into an argument with L.J. during a custody exchange involving the minor child. The Appellant allegedly hit L.J. and broke a police car window after being arrested by the police. The DYFS substantiated the Appellant from this incident finding that she placed the child at risk of harm by getting into a physical altercation with L.J. while the child was present. (3T 13-7 to 14-12).

After the initial removal of the child from both parents the court ordered the child be returned to the care of L.J. Dr. Barr evaluated both parents and recommended the child be returned to L.J. and not the Appellant. Dr. Barr further recommended supervised visits for the Appellant. (3T 14-13 to 15-13).

On cross-examination, Mr. Sterner testified that when the DYFS first received a telephone call from L.J. regarding the September 18, 2010 incident, the DYFS first advised L.J. to follow the court order and return the child to the Appellant.

However, after there was a conference with the DYFS supervisor, the supervisor called L.J. back and instructed L.J. to bring the child from Chester, PA, across state lines to Salem County to the DYFS office, even though the child was safe at the time with L.J.  The child was then removed from both parents and placed in foster care for several weeks.  When the child was brought to the DYFS the child was fine and in good health. (3T 26-13 to 29-20).

The child had been in the primary care of the Appellant up until that point before being removed. (3T 29-24 to 30-1).  Mr. Sterner testified that Dr. Baruch was not able to consult with the other medical providers that were treating the Appellant because he did not have the records and the Appellant did not sign the releases; however, on further cross-examination Mr. Sterner admitted that the Appellant signed medical releases provided by the DYFS to obtain the records from her primary care doctor, Dr. DeBrille, her psychiatrist, Dr. Meehan, and her psychologist, Dr. Comasaroff, in September and October of 2010.  The releases she signed were faxed by DYFS to the providers. (3T 30-18 to 32-13.

Mr. Sterner was asked on cross-examination why the DYFS did not provide the records to Dr. Baruch but Mr. Sterner could not state if the records requested were received and could not indicate if there was ever a follow up by the DYFS to get the

13

records that were requested. In any event Dr. Baruch did not have the records to review of the Appellant's treatment from her doctors at the time. (3T 33-2 to 18).

Dr. Baruch recommended an increase in her medication and that she take an anger management class which she took as well as a parenting skills class. (3T 33-19 to 34-24). Dr. Baruch also made recommendations for L.J. Dr. Baruch recommended he have a psychological examination. Dr. Schroder in her evaluation of L.J. recommended that he undergo an evaluation at the Keystone Center in Chester, PA, but Mr. Sterner was not aware if he followed through with that recommendation. The DYFS did not do anything to insist that L.J. follow through with that recommendation. (3T 35-22 to 37-15).

Mr. Sterner testified that Dr. Baruch stopped treating the Appellant based upon his belief that she was not taking her medication and did so based only on one call to a pharmacy in New Jersey and not based on any communications with any of her treating doctors or reviewing the records of Dr. DeBrille, Dr. Comasaroff, or Dr. Meehan. (3T 38-24 to 39-23).

After Dr. Baruch discontinued treatment of the Appellant in April of 2011, the DYFS did not provide any services to the Appellant until August of 2011 when they scheduled her for an intake appointment at Bridgeton Hospital. (3T 42-23 to 43-20). In June of 2011, the Appellant sent a letter to the DYFS asking

14

for guidance on services in the aftermath of Dr. Baruch
terminating his services.  The DYFS received the letter;
however, the DYFS did not provide her with any services at that
time so she was not being non-compliant with any services in as
much the DYFS was not providing any services. (3T 43-25 to 47-
24).

In regards to Dr. Baruch's recommendation that the
Appellant receive a partial hospitalization care, she was
referred to Bridgeton Hospital for an evaluation and it was not
recommended for her.  However, the Appellant was recommended for
out patient one on one counseling which the Appellant was
compliant with. (3T 50-21 to 51-20).  Mr. Sterner admitted that
the Appellant was receiving care from her providers between
April 2011 and August 2011 even though they did not have any
records and he admitted that there was a difference in opinions
between Dr. Baruch and her doctors but the DYFS did not
investigate the reason for the difference in opinion. (3T 51-21
to 52-13).

Dr. Barr evaluated the Appellant's parents to see if they
would be appropriate supervisors and his initial opinion was
they were. (3T 52-20 to 53-7).  In fact, Dr. Barr's opinion of
the MGM and MGF being appropriate caretakers continued from
December 2011 until February 2012 when he changed his mind due
to him receiving a letter from DYFS indicating the MGM was

15

sending letters to DYFS regarding the care of the minor child with L.J. The letters that were received from the MGM which were advocating on behalf of the Appellant were sent to Dr. Barr. After he reviewed the letters he changed his opinion about the MGM and MGF supervising the visits. One of the letters written by the MGM was in regards to concerns about the care of the minor child with L.J. The letter ·discussed MGM's concerns about the black eye that was observed on the child in February 2012. (3T 54-1 to 58-22).

Mr. Sterner was asked what the Appellant needed to do in order to be compliant with the DYFS and his response was to comply with medical monitoring and counseling but he was not aware that the Appellant was receiving those services from her doctors, Dr. DeBrille, and Dr. Comasaroff. He was asked on cross-examination why those doctors could not provide the services and his response was they did not have records from those providers even though the Appellant signed releases for those doctors in October of 2010. (3T 59-12 to 61-21). The DYFS never considered having the Appellant's doctors provide the services to her that they required. The DYFS was also not aware of any episodes of explosive behavior by the Appellant since the September 2010 incident. (3T 62-1 to 23).

## LEGAL ARGUMENT

### POINT ONE

THE TRIAL COURT COMMITTED ERROR BY FINDING THE
APPELLANT ABUSED OR NEGLECTED HER CHILD AND THE LOWER
COURT'S DECISION SHOULD BE REVERSED.

The trial court found that the child was at substantial
risk of harm because of the uncontrolled aggression of the
Appellant that resulted in an assault on the father of the
child. (1T 66-1 to 4).  The court order states that the finding
was by a preponderance of the evidence that the Appellant
"abused or neglected her child in that she had uncontrolled
aggression toward [L.J.] which resulted in [Appellant]
assaulting [L.J.] while [the minor child] was nearby during a
court ordered custody exchange." (Da84).  The court's finding is
erroneous because it fails to specifically articulate how the
minor child was placed at a substantial risk of harm.  The mere
presence of the child in the vicinity of an act of domestic
violence in the absence of additional proofs is insufficient to
sustain a finding of abuse or neglect under N.J.S.A. 9:6-
8.21(c)(4).  See N.J. Div. of Youth and Family Servs. v. S.S.,
372 N.J. Super. 13 (App. Div. 2004), cert. denied, 182 N.J. 426
(2004)(Court found the Division never met its initial burden of
demonstrating harm to the child since there was no evidence that
the mother was a danger to the child and there was no reason to
presume that the child's witnessing of the domestic abuse had a

present or potential negative effect on the child sufficient to warrant a finding of abuse against the mother). Since the court failed to find the connection between the act of domestic violence towards the other parent and the substantial risk of harm it placed upon the child, the finding of the court is erroneous and this Honorable Court should reverse the finding of the lower court.

Parents are entitled to full findings of fact and conclusions of law at the fact-finding stage of a proceeding. N.J. Div. of Youth and Family Servs. v. J.Y., 352 N.J.Super. 245, 260-261 (App. Div. 2002). The court is obligated to adequately state the grounds for its determination. N.J.S.A. 9:6-8.50(d). The scope of an appellate panel's review of a Family Part judge's factual findings is limited. N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 278-279 (2007). The appellate tribunal must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record. In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993). Where the issue to be decided is an alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, we expand the scope of our review. N.J. Div. of Youth and Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-189). Despite

such circumstances, deference will still be accorded the trial judge's findings unless it is determined that they went so wide of the mark that the judge was clearly mistaken. Ibid.

The purpose of a Title Nine fact-finding hearing is to determine whether a child has been abused or neglected pursuant to N.J.S.A. 9:6-8.44, not to assign guilt to a defendant. See N.J. Div. of Youth and Family Servs. v. I.H.C., 415 N.J. Super. 551, 581 (App. Div. 2010).

In the present case, the court found under N.J.S.A. 9:6-8.21(c)(4)(b) that the Appellant abused or neglected her child while exchanging the child with the father because she became angry, and her uncontrollable anger culminated in her striking the father twice in the head which caused a chaotic scene in which police were summoned. Furthermore, she resisted arrest and had to be restrained by the police and placed in the police vehicle. She then kicked out a window of the police cruiser. (1T 66-1 to 18).

The court further stated that the Appellant was out of control and people were worried about the baby and the baby was at a substantial risk of harm because of the chaotic situation. (1T 66-22 to 25). However, prior to those remarks the court stated the Appellant was punching the father while the child was 'nearby.' The judge then said, "I can't determine with certainty that the child was in the arms of someone standing

19

outside of the car or being transferred inside the car at that point; and to me. It makes little difference." (1T 20 to 25).

The rationale of the court's finding was not based upon the evidence presented to him at the hearing but was based upon the court's unsubstantiated prediction of the future. This analysis is found in the court's final holding when the court states:

> If every time there was an act of domestic violence there was a serious attack on a partner, when the child is nearby, and this is essentially in the same room, I have to wait until the child is harmed before I make this finding, it would be a serious, I think, lack of protection of the children. I don't believe that's what the legislature intended; and I, therefore, make the Title IX finding for the reasons I have set forth. (1T 67-9 to 17).

Although the case law holds that the court "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect," In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999), it is still the State's burden to demonstrate by a preponderance of the competent, material and relevant evidence (N.J.S.A. 9:6-8.46b) to prove the probability of present or future harm. N.J. Div. of Youth and Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004), cert. denied, 182 N.J. 426 (2004)

At the fact finding the only evidence presented by DYFS were four exhibits. Only two of the documents, a screening summary, dated September 20, 2010, (Da95 to 109), and an investigation report, dated September 20, 2010, (Da110 to 119),

were DYFS records.  The other two documents were court records from Brookhaven Court, Pennsylvania, and a Certificate of disposition from the Delaware County, Pennsylvania Court.  There was no testimony from any witness on behalf of the DYFS.  The Appellant testified on her behalf.

The evidence presented was insufficient for a finding of abuse and neglect against the mother, notwithstanding, the court's finding that the Appellant committed an act of domestic violence upon the father.  There was no evidence at all presented that the baby was ever in danger or that the baby was placed in harm.  The baby was 12 months old.  There was no evidence presented that the other adults present were concerned about the child.  There was no testimony or evidence that the baby saw the events let alone comprehended what was occurring. There was no evidence presented that indicated that the child was not in good health when DYFS removed the child from L.B.'s care or that the child was ever physically harmed by the Appellant prior to this incident.

The court in its own findings determined it was irrelevant where the baby was when the events unfolded.  The court's finding here was an unsubstantiated, unsupported, unreasonable attempt to predict the future.  In short, the court found the Appellant to have abused and neglected her child because her anger towards the father here would somehow result in a future

21

injury to the child and the court had to make a finding now to prevent this untold future event.

The Appellant argues that the State failed to meet its burden here by a preponderance of the evidence because there was no evidence that the baby was placed at risk of harm during the incident or was at risk of harm in the future. The facts here make this case similar to S.S. and distinguishable from I.H.C. There was expert testimony in I.H.C. that supported the court's finding but here just like in S.S. the DYFS presented no evidence at all that the child was in danger either now or in the future. There was no prior history of domestic violence presented here. The court's finding is erroneous without any additional proof that the child was placed at risk of harm then or in the future.

Based upon the above, the Appellant submits the lower court's finding of abuse and neglect should be vacated and her name must be removed from the DYFS Central Registry.

## POINT TWO

THE CASE SHOULD HAVE BEEN DISMISSED AND THE CHILD
SHOULD HAVE BEEN RETURNED TO THE MOTHER'S CARE BECAUSE
THE DYFS FAILED TO PROVE BY A PREPONDERANCE OF THE
EVIDENCE THAT THE CHILD WAS ABUSED OR NEGLECTED BY
L.B.

The Appellant incorporates the arguments set forth above in
Point One herein at length and adds the following. Under Title
Nine, after the fact-finding hearing, the court may dismiss the
complaint if it concludes that either its assistance is not
required on the record before it, or the Division failed to
establish abuse or neglect. N.J.S.A. 9:6-8.50(c). N.J. Div. of
Youth and Family Servcs. v. G.M., supra., at 401.

The Appellant argues that since the DYFS failed to sustain
its burden in this case the dismissal of the case should have
resulted in the parties and the child being placed back into the
same custodial arrangement it was prior to the DYFS's
involvement. The Appellant argues it was erroneous for the
court to have continued the litigation beyond the fact finding
hearing. The court should have terminated the litigation and
ordered the return of the minor child to the legal and physical
custody of the Appellant. N.J. Div. of Youth and Family Servcs.
v. N.D. (In re T.W.) 417 N.J. Super. 96 (App. Div. 2010) (The
court held without a finding or stipulation of abuse or neglect,
the judge had no authority to enter an order of disposition
under N.J.S.A. 9:6-8.51 placing a child who had been removed

23

from his mother's custody to the custody of his father). All further actions taken and orders entered by the lower court beyond the fact finding should be vacated, including the final dispositional order that granted legal and physical custody to the father, L.J.

Based upon the failure of the DYFS to sustain its burden under this Title Nine litigation, this Honorable Court should reverse the lower court's finding of abuse and neglect and vacate the final dispositional orders under both Docket Nos. SAL-FN-17-39-11 and SAL-FD-17-157-09, which granted legal and physical custody to the father, L.J., and order the minor child be returned to the physical and legal care of the Appellant.

POINT THREE

THE COURT COMMITTED ERROR BY AWARDING PHYSICAL AND
LEGAL CUSTODY TO THE FATHER, L.J.

The court's decision to award custody of the minor child to
the father, L.J., was erroneous because the DYFS failed to
establish it made reasonable efforts to re-unify the child with
the Appellant, or it was unsafe to return the child to the
Appellant. Furthermore, the dispositional hearing is
procedurally flawed because the DYFS and the court violated the
Appellant's due process rights since the trial court never
conducted a permanency hearing, pursuant to N.J.S.A. 30:4C-61.2.,
before conducting the G.M. hearing. Finally, neither the DYFS
nor the father, L.J., established by a preponderance of the
evidence that it was in the best interest of the minor child to
be in the father's custody over the Appellant.

a. Appellant's due process rights were violated by the
court proceeding to a G.M. hearing without relieving the DYFS
from its obligation to provide reasonable efforts to re-unify
the family and by not conducting a permanency hearing.

The statutory framework of Title Nine provides that upon a
finding of abuse and neglect, the offending parent or guardian
is entitled to a dispositional hearing to determine whether the
children may safely return to his or her custody, and if not,
what the proper disposition should be. N.J. Div. of Youth and
Family Servcs. v. G.M., supra., at 387-388.

At the dispositional hearing the court may consider "only material and relevant evidence." N.J.S.A. 9:6-8.46(c). Notably, the court has multiple alternatives in determining the appropriate disposition. The court may enter a suspended judgment, N.J.S.A. 9:6-8.52; release the child to the custody of the parent or guardian responsible for the child's care at the time of the filing of the complaint, N.J.S.A. 9:6-8.53; place the child with "a relative or other suitable person," N.J.S.A. 9:6-8.54(a); make an order of protection, N.J.S.A. 9:6-8.55; place the offending parent or guardian on probation, N.J.S.A. 9:6-8.56; and/or require the offending person to accept therapeutic services, N.J.S.A. 9:6-8.51(a). In all cases the court "shall state the grounds for any disposition made." N.J.S.A. 9:6-8.51(b). N.J. Div. of Youth and Family Servcs. v. G.M., supra., at 399-400.

In any case in which the division accepts a child in care or custody, the division shall make reasonable efforts, prior to placement, to preserve the family in order to prevent the need for removing the child from his home. After placement, the division shall make reasonable efforts to make it possible for the child to safely return to his home. N.J.S.A. 30:4C-11.1(b). In the present case, the DYFS failed in its obligation to provide reasonable efforts to make it possible for the child to be safely returned home. At the onset of the case the Appellant

26

was ordered to undergo psychological evaluations with Dr. Roger Barr. She attended the initial evaluation with Dr. Barr as well as requested updated evaluations. The Appellant was scheduled for a psychiatric evaluation which she attended at the Psychiatric and Addiction Services of Southern New Jersey. In addition to complying with these services the Appellant was under the care of her set of doctors; her primary care doctor, Dr. DeBrille, her psychiatrist, Dr. Meehan, and her psychologist, Dr. Comasaroff.

The DYFS caseworker, Mr. Sterner, conceded the Appellant was compliant with the evaluations and she was under the care of her physicians from April 2011 through August 2011. Mr. Sterner testified that the Appellant signed releases to have her doctors provide her records to DYFS but he could not explain why the DYFS never received the records. (3T 33-2 to 18; 3T 51-21 to 52-13; 3T 59-12 to 61-21). The psychiatrist, Dr. Baruch, recommended an increase in her medication and that she take an anger management class which she took as well as a parenting skills class. (3T 33-19 to 34-24).

Mr. Sterner testified that Dr. Baruch stopped treating the Appellant based upon his belief that she was not taking her medication and did so based only on one call to a pharmacy in New Jersey and not based on any communications with any of her

treating doctors or reviewing the records of Dr. DeBrille, Dr. Comasaroff, or Dr. Meehan. (3T 38-24 to 39-23).

Although Dr. Baruch discontinued treatment of the Appellant in April of 2011, the DYFS did not provide any services to the Appellant until August of 2011 when they scheduled her for an intake appointment at Bridgeton Hospital. (3T 42-23 to 43-20). In June of 2011, the Appellant sent a letter to the DYFS asking for guidance on services in the aftermath of Dr. Baruch terminating his services. The DYFS received the letter but did not respond to the letter. (3T 43-25 to 47-24). The only service the DYFS provided to the Appellant after April 2011 was scheduling the evaluation recommended by Dr. Baruch. She was referred to Bridgeton Hospital for the evaluation and partial hospitalization was not recommended for her. She was recommended for out patient one on one counseling which the Appellant was compliant with. (3T 50-21 to 51-20).

Dr. Baruch never contacted her treating doctors before he terminated his services. He based his decision to terminate services upon the unproven belief that she was not taking her medications. He made this determination based upon a single telephone call to a pharmacy that the client reported she obtained her prescriptions. (3T 38-24 to 39-23). He never asked her if she received prescriptions from another pharmacy. His methodology was illogical. In any event after he terminated his

28

services the DYFS never provided the Appellant with another
psychiatrist.

The DYFS requested that the Appellant comply with medical
monitoring and counseling.  (3T 59-12 to 15).  Mr. Sterner could
not comment on whether or not her own doctors could provide
these services because DYFS did not have the records.  However,
he admitted the Appellant signed releases as early as September
and October 2010 but the DYFS never obtained the records from
her doctors. (3T 59-16 to 61-21).  The Appellant was being
compliant with the recommendations of the DYFS experts
notwithstanding the fact that the DYFS was not providing the
reasonable efforts to re-unify her with her child.

The reason for the removal and the finding of abuse and
neglect was the Appellant's acts of aggression and sudden
outbursts.  The recommended course of treatment was medical
monitoring, counseling, anger management, and parenting classes.
The Appellant completed the parenting classes and the anger
management.  However, the DYFS fell short of providing the
medical monitoring and counseling after Dr. Baruch refused to
treat the Appellant and after the therapist also terminated his
treatment with her because she and her mother came to his
without an appointment to confront the therapist about a dispute
regarding her attendance at therapy.  The DYFS also did not
provide another therapist to the Appellant.

29

Even though the DYFS failed to provide new service providers to the Appellant she continued with her own doctors but the DYFS did not follow up to verify that she was obtaining the recommended services.  If DYFS does not provide the services and make reasonable efforts to make it possible for the child to safely return to his home then DYFS should at least make reasonable efforts to verify that the Appellant is obtaining those services on her own.  Here the DYFS did neither.

Instead of abiding by its statutory obligation to make reasonable efforts to re-unify the family, the DYFS essentially washed their hands in this case and recommended that the child be placed with his father so they could be relieved of any further obligations.  The DYFS was never relieved of their obligation to provide services.  They never applied to the court to be relieved of their obligation.  N.J.S.A. 30:4C-11.2 does not provide a license to DYFS to ignore attempts at contact by biological parents whose children have been placed in DYFS's custody and whose rights have not been terminated, especially in the absence of evidence of the entry of any order pursuant to N.J.S.A. 30:4C-11.3 relieving DYFS of its obligation to provide efforts toward reunification of the child with the parent. N.J. Div. of Youth and Family Servcs. v. S.A., 383 N.J. Super. 525 (App. Div. 2006).

The DYFS wanted to fast track this case to disposition after the fact finding hearing on April 15, 2011, when they announced to the court it was their intention to ask the court to conduct a disposition hearing in July or August since they wanted to terminate litigation and give custody of the child to L.J.  Their request was made only six and half months after the case was opened.  The court even asked the DYFS if they wanted him to set a G.M. hearing on April 15, 2011. (1T 86-11 to 87-2). There is no dispute that a permanency hearing was never held in this case.

N.J.S.A. 30:4C-61.2 requires that a permanency hearing "shall" be held.  The purpose of the hearing is to provide review and approval by the court of the placement plan either within 30 days after the determination of an exception to the reasonable effort requirement to reunify the child with the parent in accordance with N.J.S.A 30:4C-11.3, or no later than 12 months after the child has been in placement.  After conducting a compliance review hearing on May 18, 2011, and June 14, 2011, the court scheduled the G.M. hearing to start on September 26, 2011, just one year and six days after the initiation of this case.

DYFS's policy cannot supersede the paramount authority of the court with its traditional parens patriae responsibility and legislative tasking of approving the permanency placement plans

31

of children removed from their homes; if the court possesses the
responsibility and authority to approve such plans, under
N.J.S.A. 30:4C-61.2, it follows logically that when a bona fide
dispute is presented by parties with standing, between competing
plans that are reasonably plausible, it is the court that must
resolve the dispute. This result is required by the New Jersey
Child Placement Act, N.J.S.A. 30:4C-50, et. seq. In re
Guardianship of C.R., 364 N.J. Super. 263 (App. Div. 2003).

> In analyzing a due process claim, a court will balance
> three factors:
>
> (1) identification and specification of the private
> interest that will be affected by the official action;
> (2) assessment of the risk that there will be an
> erroneous deprivation of the interest through the
> procedures used . . .; and (3) evaluation of the
> governmental interest involved, including the added
> fiscal and administrative burdens that additional or
> substitute procedures would require.

N.J. Div. of Youth and Family Servcs. v. M.Y.J.P., 360 N.J.
Super. 426, 465 (App. Div.), cert. denied 177 N.J. 575 (2003),
cert. denied 540 U.S. 1162, 124 S.Ct. 1176, 157 L.Ed. 2d 1207
(2004)

Here the Appellant disputed the DYFS's plan to stop
services and terminate litigation with the father having custody
of the child and the Appellant only having supervised visits
with DYFS approved supervisors.  She sought re-unification.  She
was terminated from DYFS services without cause.  The services
providers did not terminate her for non-compliance, they
terminated services because they did not want to deal with her

questioning them.  The DYFS was required to either move to be relieved of providing services or wait until 12 months from the date of removal before applying for a permanency plan to the court before taking the next step of a G.M. hearing.  It is clear hear that the DYFS sought to end this case quickly to be relieved of any further financial responsibility to provide services to the Appellant to re-unify the child with her.  Such dereliction of duty on their part was apparent since they did nothing for her after April 15, 2011, the day of the fact finding.  The court was required to hear and approve of a permanency plan before conducting a G.M. hearing.  These statutory required procedures did not occur here.  These requirements are mandated to protect the rights of the parent.

The Appellant's due process rights were violated by the DYFS and the court by proceeding to a G.M. hearing before relieving the DYFS from its obligation to provide reasonable services to re-unify the family and by never holding the statutory required permanency hearing.  Since the DYFS and the lower court violated the Appellant's due process rights, this Honorable Court should reverse the lower court's order granting custody of L.J.B. to the father and remand the matter back to the lower court for a permanency hearing before proceeding with any disposition hearing on custody.

### b. Neither the DYFS nor the father established it was in the best interest of the child to award custody to the father.

The Appellant incorporates the arguments set forth above in Point Three (a) herein at length and adds the following: When the plan of the DYFS is to change custody of the child from the parent who had custody prior to their involvement to the other parent, as part of the G.M. the court must determine what is in the best interest of the child. A party seeking to modify custody must demonstrate changed circumstances that affect the welfare of the children." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007). Once the court determines a post-judgment event is a "changed circumstance" warranting reevaluation of a custody arrangement, the "best interests" of the child control the subsequent custody award. Beck v. Beck, 86 N.J. 480, 497 (1981) ("The paramount consideration in child custody cases is to foster the best interests of the child.").

At the G.M. hearing, the DYFS presented the testimony of Dr. Schroeder who gave the opinion that the father was better able to care for the child. However, Dr. Schroeder did not articulate a specific reason for this conclusion other then to generally state that the child was safer with the father then the mother because of her uncontrollable anger issues. The problem with her analysis is that she did not indicate how her

34

anger issues toward the father would endanger the child thus
making her a threat to the child's safety and well being.

During the course of her testimony she indicated that
neither parents' test results were reliable since both parents
seem to minimize their faults. The father was not forthright in
that he admitted to being arrested for urinating in public but
failed to tell her he was arrested for indecent exposure on two
other occasions. (2T 12-5 to 13-15). As to this condition, Dr.
Schroder discounted this behavior as having a negative impact on
the child. She testified that the conduct of exposing himself
to adult women, consistent with an exhibitionist disorder, was
not likely to cause an impact upon his son. She did not believe
that this conduct would have a direct impact upon raising the
child although there was a possible secondary impact that could
affect parenting such as marital discord, repeated offense which
could result in financial stress which could have a secondary
impact upon the child. (2T 13-16 to 14-6). Arguably this
analysis contradicts logical reasoning in that, a parent, as a
role model teaches a young boy that it is alright to degrade
women, how does this behavior not directly negatively impact a
child. Her opinion here discredits her opinion not only on this
issue but in all other matters in which she testified. It is
incredible that she could state that the child was not a risk of
harm in his care.

35

In regards to the bonding evaluation she testified that he had a secure attachment to the child notwithstanding her observations that at times the minor child would pull away from him indicating some insecurity. The most interesting part of the testimony was that L.J. was working in Georgia and in fact his mother was taking care of the child. He was not even the primary care giver of the child.

As to the Appellant, Dr. Schroeder reviewed several of the treating records she received from DYFS but it was not clear if she only reviewed the DYFS provider records or records from her personal doctors as well. She testified that her own observations of the Appellant led to her to state that she was paranoid during the evaluation process. (2T 23-24 to 25-13). Notwithstanding this observation, the Appellant was forthright with her interview with Dr. Schroeder because she told her that she had a Bipolar disorder and she had been diagnosed with a Schizophreniform Disorder. (2T 25-16 to 26-1). The Appellant's tests were also considered invalid since Dr. Schroeder indicated that she too minimized her faults just like the father.

The Appellant came to the bonding evaluation well prepared, with clothes, food, and activities. Dr. Schroder gave an opinion that the child was insecurely attached to the Appellant notwithstanding the fact that the child did have a relationship with her since he did desire to be picked up when she put him

36

down but she was not able to sooth the child when she picked the
child back up.  (2T 32-17 to 33-13).  However, the conditions
surrounding the Appellant's bonding evaluation were drastically
different from the father.  Due to traffic and other unspecified
delays the child arrived to the bonding evaluation asleep and
had to be awaked for the evaluation.  This caused the child to
be cranky and discontent.  The Appellant had to spend most of
her time trying to calm the child down before she could interact
with him.  These conditions placed her at a significant
disadvantage since the father's evaluation was conducted without
outside influences.  Dr. Schroder testified that the child
arriving late for the visit combined with falling asleep during
the long car ride had a negative impact upon the evaluation due
to no fault of the Appellant. (2T 44-25 to 46-20).

        The child lived with the mother from the time of his birth
until the removal, a period of 12 months.  The child was placed
in DYFS's care because the father called DYFS and told them mom
had been arrested and he did not know if he should return the
child to her care after the weekend visit.  The father did not
want to care for his son.  The father lived in Pennsylvania at
the time and the Appellant lived in NJ.  Based upon his
telephone call he was told by DYFS to bring the child to them to
be placed in foster care.  The child remained in foster care for
several weeks until DYFS asked the court to place the child with

37

dad after an evaluation by Dr. Barr recommended it.  Dr. Barr also initially recommended that the Appellant have supervised visits with the child supervised by her parents but quickly changed his mind pursuant to the insistence of DYFS.  The DYFS caused him to change his mind based on a letter the MGM sent to DYFS advocating on the Appellant's behalf.

The child was examined by DYFS when the child was placed in its care and no problems were found.  In fact, there was no testimony at all during the course of the case that the child was ever harmed while in the care of the Appellant from the time of his birth until the time of his removal.  This case was really a custody dispute case in which the father sought and got the assistance of DYFS to help him win the battle.

All of the testimony in the case discussed the psychological and emotional difficulties of the Appellant but nothing discussed how her deficits directly impacted the safety of her child.  Candidly the Appellant had a significant dislike towards the father but her problems with the father are not uncommon in contentious custody battles.  Notwithstanding her aggression towards L.J. there was no testimony or evidence that she ever let the disdain for the father interfere with her caring for the child.  Her behavior towards the DYFS providers, also contentious, was a product her admitted paranoid disorder but her distrust of the DYFS providers did not carry over into

38

.        .

any proof that it placed her child at risk or that he was directly harmed. It has been said past behavior is a prediction of the future. No past behavior here ever showed that the child was ever harmed by the Appellant or placed in harm by the Appellant such that it would be in the best interest of the child to change custody from the appellant to L.J.

Even the court's final analysis did not articulate any reasons for why the custody should have been changed. The court referred to the various reports of the DYFS providers which stated that the Appellant was a paranoid schizophrenic unable to control her anger and who was confrontational and non-complaint with her medicinal regimen. The court found that the child was reported as thriving and doing well in the father's care; therefore, the court ordered that custody be awarded to the father with the Appellant only being entitled to supervised visits with supervisors approved by DYFS. (Da176 to 178).

The court failed to acknowledge that the father was recommended to go to the Keystone Center in Chester, PA, for an evaluation but DYFS was never able to confirm his attendance because DYFS never followed up. (3T 35-22 to 37-15). The court failed to address any of the deficits testified to about the father in its final analysis. There was no discussion about the father's lack of candor during his psychological evaluation with

Dr. Schroder or how his indecent exposure behavior impacted his ability to parent his son.

N.J.S.A. 9:2-4(c) in pertinent part states:

In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.

No where in the court's decision did the court consider any of the factors set forth in N.J.S.A. 9:2-4(c). The court's decision was a one sided condemnation of the Appellant's psychological and emotional state without articulating or analyzing at all how her problems "had a substantial adverse effect on the child." The court simply followed the wishes of DYFS who did not want to provide any services to the Appellant to re-unify but simply wanted to place custody of the child with

.    -

the father and then walk away after they removed the child from
her care.

What's most interesting is after the court agreed with the
DYFS to terminate litigation in the Title 9 matter, the court
still required DYFS to be involved in further parenting time by
stating in the Order: "[L.B.'s] parenting time shall continue as
previously ordered until the Division provides a list of
Division approved supervisors for [L.B.'s] visitation with the
child to all counsel. . . Any further applications regarding
custody or modifications of parenting time shall be filed under
FD-17-157-10, with notice to the Division." (Da173).  DYFS was
so anxious to get out of this litigation that the DAG at the
hearing asked the court to terminate litigation with the parties
working out the details but the problem was the parties were not
able to work out the parenting time.  The DAG insisted that the
Appellant's uncle was an approved supervisor and he could serve
as the supervisor but he was the only person.  The end result
was restricting the Appellant to parenting time only on weekends
or holidays when the uncle was available.  (4T 31-16 to 34-3).
The chaos of the litigation seemed to continue even after entry
of the final order terminating the case.

The court failed to determine the custody in the case based
upon the best interest standard but simply ruled that due to the
Appellant's behavior she was unfit.  However, it is erroneous to

41

## CONCLUSION

Based upon the foregoing arguments, the Appellant respectfully asks this Honorable Court to reverse the lower court's finding of abuse and neglect as to the Appellant, L.B., dismiss the Title Nine litigation, vacate the lower court's Order awarding custody of the minor child, L.J.B., to L.J., and award custody of the minor child to the Appellant, L.B.

In the alternative, the Appellant respectfully asks this Honorable Court to vacate the lower court's Order awarding custody of the minor child, L.J.B., to L.J., and remand the matter back to the lower tribunal for a permanency hearing.

Respectfully submitted

David A. Snyder, Esquire
2 White Horse Pike
Haddon Heights, NJ  08035
856-547-5888
Fax 856-547-5885
e-mail: dasnyderlaw@aol.com
Counsel for the Appellant
L.B.

Dated: 8/20/12