# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4437-11T3

NEW JERSEY DIVISION OF
YOUTH AND FAMILY SERVICES,

       Plaintiff-Respondent,

v.

L.B.,

       Defendant-Appellant,

and

L.J.,

       Defendant-Respondent.

_____

IN THE MATTER OF L.J.B.,

       a Minor.

_____

Submitted February 12, 2013 - Decided April 17, 2013

Before Judges Hayden and Hoffman.

On appeal from the Superior Court of New
Jersey, Chancery Division, Family Part,
Salem County, Docket No. FN-17-39-11.

David A. Snyder, attorney for appellant.

Jeffrey S. Chiesa, Attorney General,
attorney for respondent New Jersey Division
of Youth and Family Services (Lewis A.
Scheindlin, Assistant Attorney General, of
counsel; Mara Spiegeland, Deputy Attorney
General, on the brief).

> Joseph E. Krakora, Public Defender, Law
> Guardian, attorney for minor L.J.B. (Melissa
> R. Vance, Assistant Deputy Public Defender,
> on the brief).
>
> Lauren H. Kane, attorney for respondent
> L.J., joins in the brief of minor L.J.B.

PER CURIAM

Defendant L.B. (Lacy) appeals from a April 15, 2011 Family Part order which found that she committed abuse and neglect of her then one-year-old son, L.J.B. (Levon).[1] She also claims the court erred in granting custody of Levon to his father, L.J. (Lucas) For the reasons that follow, we affirm.

I.

We summarize the facts from the record on appeal. Levon was born in August 2009. Lacy and Lucas ended their relationship before Levon's birth. In 2005, Lacy was diagnosed with schizophreniform disorder, and was prescribed antipsychotic medication by a psychiatrist. She was also treated by a psychologist on a monthly basis.

By 2010, Lacy and Lucas were involved in an ongoing custody dispute. Plaintiff New Jersey Division of Youth and Family Services (the Division),[2] first became involved with Levon in

---

[1] We use fictitious names to refer to the individuals in this case for purposes of confidentiality and clarity.

[2] On June 29, 2012, the Governor signed into law A-3101, which reorganized the Department of Children and Families, including (continued)

2                                                          A-4437-11T3

March 2010 when Lacy reported finding a scratch on Levon's penis after Lucas returned him following visitation.   The Division determined the claim to be unfounded.

On May 28, 2010, Lucas made an allegation of neglect against Lacy regarding an incident between Lacy and her neighbor.   Police officers responded and observed Lacy throwing eggs at her neighbor's vehicle.   Lacy was arrested and charged with criminal mischief, disorderly conduct, resisting arrest and aggravated assault of a police officer.   The Division investigation determined allegations of neglect were unfounded.

On September 20, 2010, the Division received a report from Lucas concerning a violent incident that occurred during a visitation exchange at a McDonald's on September 18, 2010. Lucas stated that Lacy hit her mother and then struck him twice in the head; when the police arrived, Lacy resisted arrest and was placed in a police vehicle, where, in a fit of aggression, she kicked out one of the windows. After confirming the incident with police, the Division conducted an emergency removal of Levon and the child was placed in a resource home.

---

(continued)
the renaming of the Division of Youth and Family Services as the Division of Child Protection and Permanency.   L. 2012, c. 16, eff. June 29, 2012.

On September 23, 2010, the Division filed a verified complaint alleging abuse and neglect of Levon by Lacy, pursuant to N.J.S.A. 9:6-8.21 to -8.73 and N.J.S.A. 30:4C-12. On the same date, the judge entered an order to show cause confirming the removal of Levon from his mother's custody because she "had a mental breakdown that caused a violent reaction with police involvement[.]"   The judge further ordered Lacy and Lucas to undergo psychological evaluations with Dr. Roger Barr.   A few days later, the Division placed Levon with his father, after assessing Lucas and the home in Pennsylvania that he shared with his parents, and finding it to be a safe and stable environment.

On October 13, 2010, the return date of the order to show cause, the court entered an order transferring legal and physical custody of Levon to Lucas, under the care and supervision of the Division.

During Dr. Barr's evaluation of Lacy on October 15, 2010, Lacy made incomprehensible statements such as "I thought my tongue was different[,]" and, "the devil was a lawyer."   She told Dr. Barr that she assaulted Lucas at the visitation exchange because of the "urine soaked nipples."   Dr. Barr made the following observations from his evaluation:

> [S]everal facets of her life coalesced, which indicated paranoid ideation, thought disorder, poor judgment, and an incapacity to control herself in public places . . .

4

A-4437-11T3

.    .

>Aspects of her interview yielded signs associated with impaired thinking with no reality referent; fantasy dominated her thinking. Her formal test data were unable to be reliably and validly interpreted due to an unrealistic view of self and exceedingly high levels of defensiveness and denial, which further impede her judgment. Her conduct in May and September 2010 question the veracity of her statements that she continues to take her prescription of Abilify and consults with her physician on a tri-monthly basis . . . [Lacy's] visitation with her son should remain supervised in the Division's offices. A high risk exists for abrupt and explosive acting out if she becomes agitated even in a structured setting, such as the Division's offices.

On November 16, 2010, Dr. Edward Baruch performed a psychiatric evaluation of Lacy. Doctor Baruch noted that Lacy's "history of psychiatric illness, symptoms, and treatment were at times vague, and may not be accurate, as at times she appeared confused[.]" Dr. Baruch recommended intensive outpatient treatment for Lacy's mental health issues due to her "inability to parent adequately, her psychotic symptoms, and her lack of insight as to her past and present situation[.]" He concluded that Lacy suffered from either bipolar or schizoaffective disorder.

On April 15, 2011, a fact-finding and dispositional hearing was held before Judge Darrell Fineman. During the hearing, the Division introduced in evidence, without objection, screening and investigation summaries and court records regarding the

incident at the McDonald's on September 18, 2010. Lacy was the only witness to testify.

On direct examination, Lacy testified that she and Lucas were standing in the McDonald's parking lot, Levon was in her arms, and her parents were standing on either side of her. After Lucas refused to spend visitation time with Lacy at the McDonald's, she claimed she put Levon back in the car. She said that she then hit Lucas because he "has embarrassed me."

Lacy's testimony as to the location of Levon, who was holding him, and which members of her family were in and outside of the car varied during cross-examination and redirect examination. She first stated that her mother was holding the baby, and then that both her mother and father were holding him, during the altercation. Although she previously testified that her mother was in the car with Levon, the following exchange later took place:

> Q: Right. Was the baby in the car seat?
>
> A: No, the baby was in the front seat with my mom and [Lucas's mother.]
>
> Q: Where was your mom?
>
> A: Standing outside the car with the door open.
>
> Q: Okay. Wait, you just said they were sitting in the car -- was she in it?

> A: My mom wasn't sitting in the car,
> [Lucas's mother] was sitting in the car.

A caseworker report containing Lucas's version of the incident, admitted into evidence without objection, offered a different version of events.

> [Lucas] informed [the caseworker] that he was recently granted visitation with his son after not seeing him since April . . . [Lucas] is court ordered to visit with his son at his home in Chester, [Pennsylvania] From Saturday at 9 [a.m.] until Monday at 6 [p.m.] [Lucas] told [the caseworker] that he went to the Brookhaven McDonald's this past Saturday at 9 [a.m.] to pick up [Levon] and [Lacy] gave him a hard time. He reported that she asked for an hour to go in McDonald's and have breakfast with [Levon] and [he] said no. . . . He informed [the caseworker] that [Lacy] was upset and because of this, she refused to hand over [Levon]. He reported that [Lacy's] mother tried to help by asking [Lacy] to hand over the baby. [Lucas] reported that [Lacy's Mother] eventually got [Levon] and was trying to work out the exchange and that is when [Lacy] started to fight her mother. [Lucas] told [the caseworker] that [Lacy] was trying to hit her mother who was holding [Levon]. He also told [the caseworker] that [Lacy's] father had to physically restrain her so she would stop hitting her mother. [Lucas] informed [the caseworker] that [Lacy] also hit him in the back of the head twice. . . . He told [the caseworker] that the police showed up and arrested [Lacy] . . . [Lucas] reported that Lacy was so out of control that she was refusing arrest and attacked a police officer . . . [and] kicked out the window of the police car.

7

An affidavit of probable cause by Brookhaven police officer Michael Habel, also admitted into evidence without objection, corroborated much of Lucas's version of events. Shortly after arriving at the scene, Officer Habel stated he observed Lacy striking Lucas "in the back of the head [two] times with a closed right hand fist."

Based upon Lacy's testimony and the evidence presented, Judge Fineman found that, on September 18, 2010, Levon was in a zone of danger. The judge determined that Lacy assaulted Lucas by punching him in the head at least twice while Levon was close by. The judge found that there was no reason for Lacy's outburst and that she was so incapable of controlling herself that the police had to restrain her, and even then, she kicked a window out of the police cruiser. The judge made a finding of abuse and neglect against Lacy, stating, in that "chaotic" situation, Lacy was "out of control" and that placed "the baby . . . at substantial risk of harm[.]"

The judge held an interim dispositional hearing immediately after this finding and determined that custody of Levon should continue with his father pending further proceedings. The Law Guardian indicated that Dr. Baruch's report on Lacy was "very frightening" and that Levon would remain at risk of harm in her care unless she took her medication or availed herself of

8                                                              A-4437-11T3

services.   The Law Guardian also noted that the child was doing well under his father's care, and that a G.M.[3] hearing was appearing more likely.   The Division asked that the court schedule a compliance review in order to determine whether a G.M. hearing would be necessary.   The judge ordered that Lacy comply with the recommendations of Dr. Barr and Dr. Baruch.   The judge also noted that Lacy should be prepared for a G.M. hearing, since "there's no indication, at least on [the] record, of ability to parent."

On September 2 and 16, 2011, Dr. Joanne M. Schroeder completed psychological evaluations of Lacy.   She noted that Lacy "appeared somewhat paranoid, with a long history of wavering back and forth in her view of frightening, dire circumstances and innocuous interpretations of the same event." Dr. Schroeder also observed that Lacy's "thought processes were suspicious, bordering on delusional."

Dr. Schroeder noted that, when she observed Levon visiting with Lacy, the child was constantly crying and Lacy could not calm him down;  Levon "repeatedly pushed her face away, becoming more upset in response to her intrusive behavior."   Dr.

---

[3] N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 399 (2009) (where the trial court has found abuse and neglect, a dispositional hearing must be held to determine the appropriate outcome of the case).

Schroeder reported signs of the child's "insecure, anxious attachment" to the mother and described Lacy's parenting as "intrusive" and "infantilizing." She further described the relationship between Lacy and Levon as "disturbed," and advised against unsupervised visits given Lacy's psychosis and her "upset and inconsolable" response.

Dr. Schroeder also conducted evaluations of Lucas on September 12 and 14, 2011. She described [Lucas] as "a safe, stable parent" and endorsed continued placement of the child with him.

On December 14, 2011, a G.M. hearing began before Judge Gary D. Wodlinger. He received testimony from Dr. Schroeder as well as Michael Sterner, the Division supervisor for the case. Dr. Schroeder testified that Lacy could not provide a safe and stable home for Levon and that she was still suffering from a psychotic illness. Sterner described the extensive psychiatric and psychological services which were offered to Lacy.

On cross-examination, he testified that Dr. Baruch was aware that Lacy had her own doctors as mentioned in Dr. Baruch's report. He further explained his understanding that Dr. Baruch was unable to consult with Lacy's psychiatrist or psychologist because Lacy refused to sign the release for him to contact

10                                                    A-4437-11T3

them.   He also stated that the Division was unaware as to whether Lacy continued services with her own providers.

Although Lacy's counsel argued that Lacy was currently in treatment and safe to parent, Lacy presented no evidence by way of expert reports or testimony to support that assertion.

After reviewing written closing arguments, Judge Wodlinger issued a written memorandum of decision on March 28, 2012. Citing the facts of the case, the testimony, and the results of the expert evaluations, the judge agreed with the Division and the Law Guardian that it would be in Levon's best interest to remain in Lucas' custody:

> [Lacy] has submitted to evaluations by at least four experts . . . All of these experts express significant concern regarding [Lacy's] mental health and her ability to safely parent [Levon] . . . Based on the expert reports entered into evidence the [c]ourt is not convinced that [Lacy] can provide a safe and stable home for [Levon] at this time. Further, the Court is unwilling to uproot [Levon] from his father's home, where he appears to be healthy and well cared for. While the [c]ourt does wish to see [Lacy] exercise parenting time with [Levon], at this time any such parenting time shall be supervised either at the Division offices or by an individual approved by the Division.

The judge issued an order that continued legal and physical custody of Levon with Lucas and provided for Lacy to have supervised parenting time, to be arranged by the Division.

A-4437-11T3

On appeal, Lacy raises the following points for our consideration:

### POINT ONE

THE TRIAL COURT COMMITTED ERROR BY FINDING THE APPELLANT ABUSED OR NEGLECTED HER CHILD AND THE LOWER COURT'S DECISION SHOULD BE REVERSED.

### POINT TWO

THE CASE SHOULD HAVE BEEN DISMISSED AND THE CHILD SHOULD HAVE BEEN RETURNED TO THE MOTHER'S CARE BECAUSE THE [DIVISION] FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE CHILD WAS ABUSED OR NEGLECTED BY [LACY]

### POINT THREE

THE COURT COMMITTED ERROR BY AWARDING PHYSICAL AND LEGAL CUSTODY TO THE FATHER, [LUCAS]

a. Appellant's due process rights were violated by the court proceeding to a G.M. hearing without relieving the [Division] from its obligation to provide reasonable efforts to re-unify the family and by not conducting a permanency hearing.

b. Neither the [Division] nor the father established it was in the best interest of the child to award custody to the father.

After considering the arguments presented in light of the record and the applicable law, we are not persuaded by Lacy's arguments. Moreover, the two trial judges' factual findings are supported by substantial, credible evidence in the record as a

12                                                          A-4437-11T3

whole, which fully buttress their legal conclusions. See <u>N.J.</u> <u>Div. of Youth & Family Servs. v. L.J.D.</u>, 428 <u>N.J. Super.</u> 451, 461 (App. Div. 2012) (citing <u>N.J. Div. of Youth & Family Servs.</u> <u>v. A.R.G.</u>, 361 <u>N.J. Super.</u> 46, 78 (App. Div. 2003), <u>aff'd in</u> <u>part, modified in part</u> 179 <u>N.J.</u> 264 (2004)).

II.

Appellate review of a trial court's finding of fact is limited. <u>In re Guardianship of J.N.H.</u>, 172 <u>N.J.</u> 440, 472 (2002). On appeal, we must defer to a trial judge's findings of fact if "supported by adequate, substantial, and credible evidence" in the record. <u>In re Guardianship of J.T.</u>, 269 <u>N.J. Super.</u> 172, 188 (App. Div. 1993) (internal quotation marks and citation omitted). We afford particular deference to decisions on issues of credibility. <u>N.J. Div. of Youth & Family Servs. v. G.L.</u>, 191 <u>N.J.</u> 596, 605 (2007) (citing <u>Cesare v. Cesare</u>, 154 <u>N.J.</u> 394, 411-13 (1998)). We only disturb the trial court's factual findings if "they are so wholly insupportable as to result in a denial of justice[.]" <u>Rova Farms Resort, Inc. v. Investors Ins.</u> <u>Co. of Am.</u>, 65 <u>N.J.</u> 474, 483-84 (1974).

A fact-finding hearing is a critical part of the abuse and neglect determination, and the judge, as fact-finder, ultimately decides whether the child was abused or neglected. <u>N.J. Div. of</u> <u>Youth & Family Servs. v. J.Y.</u>, 352 <u>N.J. Super.</u> 245, 264 (App.

Div.  2002)  (quoting  N.J.S.A.  9:6-8.44).  The  judge's
determination must be based on competent reliable evidence.  Id.
at 265 (citing N.J.S.A. 9:6-8.46; R. 5:12-4(d)).

Pursuant to N.J.S.A. 9:6-8.21(c), a parent commits abuse or
neglect if he or she, inter alia:

> inflicts or allows to be inflicted upon such
> child  physical  injury  by  other  than
> accidental means . . . creates or allows to
> be created a substantial or ongoing risk of
> physical injury to such child by other than
> accidental means . . . or . . . [places a
> child]  in  imminent  danger  of  becoming
> impaired as the result of [his or her]
> failure . . . to exercise a minimum degree
> of care . . . in providing the child with
> proper supervision or guardianship[.]

This standard can be met by "conduct that is grossly or
wantonly negligent, but not necessarily intentional." G.S. v.
Dept. of Human Servs., Div. of Youth and Family Servs., 157 N.J.
161, 178 (1999). Such a finding "cannot be described with
mathematical precision[,]" and "can apply to situations ranging
from 'slight inadvertence to malicious purpose to inflict
injury.'" Ibid. (quoting McLaughlin v. Rova Farms, Inc., 56
N.J. 288, 305 (1970)).

"[U]nder a wanton and willful negligence standard, a person
is liable for the foreseeable consequences of her actions,
regardless of whether she actually intended to cause injury."
Id. at 179; See, e.g., N.J. Div. of Youth and Family Servs. v.

A-4437-11T3

M.C. III, 201 N.J. 328, 345 (2010) ("Defendant intentionally grabbed the children and disregarded the substantial probability that injury would result from his conduct.").

### III.

Judge Fineman found that Lacy hit Lucas "at least twice" and had to be restrained by her father, thus rejecting Lacy's testimony as not credible, since Lacy claimed she only hit Lucas once and was vague as to her father's role during the incident. Lacy's statements during the fact-finding hearing were contradictory and confused, and conflicted with events described in the police reports.

Additionally, it is appropriate to view this incident in relation to Lacy's substantial mental health issues. The record is replete with references to her anger, hostility, and irrational thoughts. Lucas noted that Lacy became increasingly confrontational and paranoid after giving birth to Levon. Lacy acted irrationally and destructively by throwing eggs at her neighbor's car only months before attacking Lucas and her own mother at the McDonald's.

Furthermore, Dr. Barr cited a tendency for irrational thought and "a high risk [] for abrupt and explosive acting out." He also noted evidence of "paranoid ideation, thought disorder, poor judgment, and an incapacity to control herself in

public places, also with police involvement." Dr. Baruch referred to Lacy's paranoia and mood outbursts, and concluded that Lacy cannot parent and is "[g]rossly psychotic." Moreover, there is evidence that Lacy was not taking her prescribed medications, which would further demonstrate her inability or unwillingness to control her behavior or exercise good decision making.

This evidence, when combined with Lacy's explosive behavior on September 18, 2010, strongly supports Judge Fineman's conclusion that Levon was at substantial risk of imminent harm if he remained in Lacy's care. Within the array of documents admitted into evidence and considered by Judge Fineman were proofs sufficient to satisfy the requirements of Title Nine, including what Dr. Barr described as Lacy's "paranoid ideation, thought disorder, poor judgment, and an incapacity to control herself in public places[,]" all of which compromised Levon's safety.

> When determining whether or not a child has been abused or neglected, the trial court must base its findings on the totality of the circumstances, since "[i]n child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the [child]. One act may be 'substantial' or the sum of many acts may be 'substantial.'" N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010).

16                                                          A-4437-11T3

[N.J. Div. of Youth & Family Serv. v. V.T.,
423 N.J. Super. 320, 329-30 (App. Div. 2011)
(alterations in original).]

We do not discern any deficiency in the fact-finding proceedings that would erode our confidence in the sufficiency of Judge Fineman's conclusions. The judge's findings were supported by adequate, substantial, and credible evidence in the record.

Lacy contends that the Division did not make reasonable efforts to preserve the family or return the child home. Lacy claims that she was compliant with her psychological and psychiatric evaluations, and signed releases for her doctors to provide the Division with her medical records. We do not agree.

Regarding reasonable efforts toward reunification, the record supports the Division's position that it provided all necessary services to Lacy, but that Lacy was belligerent and uncooperative, and too unstable to participate in services effectively. Regardless of whether Lacy was taking her medications regularly, which is far from clear, the experts who evaluated her all concluded that Lacy was paranoid and unable to parent.

Lacy refused Dr. Baruch's recommendation to change her medication. Dr. Schroeder later found that, in September 2011, Lacy was mentally ill and unfit to parent even though she was

17                                                    A-4437-11T3

taking her prescribed medication and seeing her doctors. Notwithstanding the difficult circumstances presented by Lacy's behavior and mental health problems, the Division made reasonable efforts to offer services to Lacy.

As for Lacy's claim that a permanency hearing was required, N.J.S.A. 30:4C-61.2(a)(2) provides that such a hearing must be conducted "no later than [twelve] months after the child has been in placement."[4] We note that Lacy fails to claim any harm from the failure to hold a permanency hearing, which should have been held in September 2011. By that point, the Division had clearly indicated its position that it would be unsafe to return Levon to Lacy and that Levon should remain with his father. Within less than three months of when the permanency hearing should have been held, the G.M. hearing addressed the matters which would have been addressed at the permanency hearing. While we do not approve of the failure to timely schedule and complete the permanency hearing, in this instance, there is no evidence that the failure caused any harm to Lacy or Levon.

---

[4] It appears the Division and the Family Part judge may have mistakenly concluded that a permanency hearing was not necessary since Levon was in the custody of his father. However, G.M., makes clear that the transfer of custody during a Title Nine action to the non-custodial parent is a placement under Title Nine. G.M., supra, 198 N.J. at 405.

18                                                          A-4437-11T3

Lacy further contends that the Division never established that it was in the best interest of Levon to be under Lucas' custody. Both sides presented material and relevant evidence to determine whether returning the child to Lacy would be safe. The Division presented expert testimony to show that Lacy was unfit to parent, based on psychological evaluations, medical history, and a bonding evaluation. After Dr. Schroeder determined that Lacy was unsuitable to parent Levon, she conducted an evaluation of Lucas, and recommended that it was in the child's best interests to remain in his father's custody. The trial judge, after considering the record, agreed with the Division and ordered that Levon remain in the father's custody. The Division contends that the procedures followed by the court were sound, and that the Division presented sufficient evidence to support the court's determination.

In G.M., the Supreme Court held that, prior to considering the best interests of the child, the trial court must hold a dispositional hearing "to determine whether the [child] may safely be released to the custody of [the parent], who was responsible for their care at the time of the filing of the complaint, or whether, consistent with N.J.S.A. 9:6-8.51, some other disposition is appropriate." G.M., supra, 198 N.J. at 402.

.   ·   ▲

There was adequate evidence in the record to find that Lacy was unfit to parent. Dr. Schroeder testified as to how she believed Lacy's paranoid delusions may impact her ability to care for her child. When offered a hypothetical situation about a medical crisis with the child, she stated that the mother may not be capable of making the correct decisions because of her distorted world view. The doctor's bonding evaluation did not focus solely on the inconsolable behavior of the child, but also on Lacy's parenting behavior, which was deemed "intrusive" and "infantilizing." The court also considered the expert opinion of Dr. Baruch, who warned that Lacy was unfit to parent. Moreover, there was no evidence that any of the circumstances causing her unfitness as a parent had changed. As such, there was sufficient evidence in the record to show that the child could not safely be placed with Lacy.

In considering whether placement with Lucas was in the child's best interests, the record contains no compelling evidence to overturn the trial court's determination. Although Lucas has had a history of poor decision-making himself, including past "exhibitionist" behavior, his recent history was stable and Lacy failed to provide any convincing evidence to show that Levon would not be safe in his care. The Division, by

contrast, offered Dr. Schroeder's expert testimony, which endorsed maintaining Levon in his father's custody.

We discern no deficiency in the dispositional proceedings that would erode our confidence in the sufficiency of Judge Wodlinger's conclusions. His findings were supported by adequate, substantial, and credible evidence in the record.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4437-11T3